MILLER WATT & Co., Appellee, v. LU B. MERCER, Appellant.

**HUSBAND AND WIFE: Wrongful Possession of Property—Implied**
**1 Promise to Return—One Purchasing Claims Against Other.** If the husband secures or takes possession of his wife's property without her knowledge or consent, the law raises the same implied promise to repay to her as it would were she a stranger to him. A wife may take and enforce a claim against her husband the same as she may against a stranger.

**HUSBAND AND WIFE: Payments by One to Other—Good Faith.**
**2** A wife holding valid, enforceable claims against her husband may take the same good-faith steps to secure payment that she could take were he a stranger.

**HUSBAND AND WIFE: Property of Wife—Husband's Dominion**
**3 Over—Estoppel.** No estoppel can arise against a wife who has permitted her husband to exercise unrestrained dominion over her property when no creditor of the husband has relied thereon or been injured thereby.

PRINCIPLE APPLIED: Action by a creditor to enforce his claim against a wife's property. The husband had no property of material value, but from time to time, the wife received from relatives $23,000 in money and about $3,400 in bank stock, which stock always stood in her name. She allowed her husband to use her money without restraint. It was generally known that he was handling her money. Failure attended all his ventures. By 1906, he had ten shares of bank stock in his own name and about $1,000 in real estate, and the wife had her said bank stock—all else had vanished. The wife's father had died and the wife had taken as part of her share of the estate an unpaid note for $1,864 given to her father by her husband. About this time, the husband secured employment with a foreign mercantile house. The husband made no representations as to the financial condition of himself or wife, except he may have said that he was worth $10,000. The company in making the contract really relied on the statement of a banker that the husband "had a good business

record, was responsible for his contracts, and was a stockholder in the bank,'' which latter statement was true. During this employment the husband contracted the debt sought to be enforced in the instant case. Some two years afterwards, the husband sold his own bank stock in order to pay his debts. He also, without the knowledge of the wife, sold her bank stock for $3,600 and entered upon another business venture. His health soon failed; he sold out and realized about $3,000, which he turned over to his wife to apply on her claim, she learning for the first time that he had sold her bank stock, and having no knowledge that he was owing plaintiff or any other creditor. *Held*, (1) that the wife in any view of the mater was a bona fide creditor of her husband to the extent of $5,400; (2) she had a right in good faith to take the $3,000 and apply on her claim; (3) she was not estopped to set up her claim against her husband's creditors.

*Appeal from Washington District Court.*—HON. K. E. WILLCOCKSON, Judge.

TUESDAY, JANUARY 19, 1915.

REHEARING DENIED FRIDAY, MAY 7, 1915.

The opinion states the case.—*Reversed.*

*Brookhart Brothers* and *Eicher & Livingston,* for appellant.

*Edmund D. Morrison* and *George F. Morrison,* for appellee.

WEAVER, J.—The defendant is the widow of Charles E. Mercer, deceased. The plaintiff was a creditor of Mercer in his lifetime, and after his death filed and secured an allowance of a claim against his estate in the sum of $526.09. There being found no available assets with which to pay the claim, plaintiff brought this action in equity against the widow. The petition states in substance that, in the year 1906, Mercer applied to the plaintiff for employment as a traveling salesman, representing himself to be the owner of bank stock and other property real and personal and to be financially responsible for his contracts, and plaintiff, relying upon said repre-

sentations, gave the said Mercer employment and advanced to him the sum of $526.09 in excess of his earnings, and that no part of said remainder has ever been paid. It is further alleged that Mercer died intestate in the year 1909 and his wife, the defendant, was duly appointed and qualified as administratrix of his estate, and that thereafter, plaintiff's said claim was duly filed and allowed. It is further alleged that the administratrix filed no inventory of the property of the estate but filed a report stating that the deceased left no estate or property to be administered upon. Plaintiff also avers that, when Mercer made the alleged representations as to his financial conditions, he was in fact the owner of bank stock in value greater than the claim in question, as well as real estate of considerable value; that thereafter, said Mercer sold the stock and invested the proceeds in a furnishing store and stock of goods at Oskaloosa, Iowa; that a one-half interest in said stock was converted by him into money shortly before his death and that he then either fraudulently or voluntarily gave the same, together with all the other money and property, to his wife, who has in fraud converted it to her own use, leaving no property or assets in the estate from which plaintiff's claim can be made. Upon these allegations, a decree is asked, requiring defendant to account for the property received by her from her husband, and that the same be ordered subjected to the payment of plaintiff's claim.

Defendant answers first in denial and further avers that the property of which it is alleged Charles E. Mercer was formerly owner was held by him in trust for the defendant, and that he was at no time the beneficial owner thereof. In reply, plaintiff pleads that defendant, by permitting her husband to hold himself out as the owner of the property and to obtain credit on faith thereof, is estopped to assert her alleged ownership as against plaintiff. By way of amendment to her answer, defendant pleads certain facts to the effect that deceased died indebted to her upon several items named, to an aggregate amount of many thousand dollars, and that upon

this indebtedness, the money and property received by her from him shortly before his death was applied as a partial payment.

Upon the trial of these issues, the court below found the equities to be with the plaintiff and entered judgment against the defendant requiring her to pay to plaintiff the amount of its claim allowed against the estate of her deceased husband, with interest and costs. It is from such decree this appeal has been taken.

The evidence shows the following facts, most of them without substantial contradiction. At the time of the marriage of Charles E. Mercer and the defendant, he had property or money to the amount of about $500. Defendant had then little or nothing in her own right, but belonged to a family of some considerable financial means. During her married life, defendant received at various times, from her father, mother and uncle, money and property to an aggregate amount of at least $23,000. Included in this sum, were fifteen shares of bank stock worth somewhere from $230 to $250 per share. She is a woman of no business experience and appears to have a very inadequate and confused idea of business affairs. She says she gave her property little attention and allowed her husband to manage it for her. He was for some years engaged with defendant's brother in general merchandising. This business had been closed out or sold before the transactions involved in this suit. The money he put into that business was doubtless taken from the funds received from his wife. Just how much this was does not appear, but when the business was settled and the debts paid, but a comparatively small amount remained, and this was in a piece of real estate in Davenport. Later, in March, 1906, Mercer had some negotiation with plaintiff, a wholesale mercantile corporation in Chicago, Illinois, to secure employment as a a traveling salesman. At this time, he owned and held in his own name ten shares in the Washington, Iowa, National Bank, worth perhaps $2,500. He also held title to a half interest in

the Davenport property, in which, after satisfying the debts of the old partnership, his margin of value was not to exceed $1,000. The bank stock which had been received by his wife still stood in her name, but the dividends from year to year were doubtless collected or ultimately received by him. It should also be said that, in the settlement of her father's estate, defendant accepted as a part of her distributive share the promissory note of her husband given to her father in his lifetime for the principal sum of $1,864.00, which was still unpaid at Mercer's death. If at this date in 1906 he had remaining any of the property received from his wife, except as above stated, the evidence does not reveal it, and for the purposes of this case it may be assumed that it had been absorbed or lost in his unprofitable ventures.

Such was the situation when Mercer applied to the plaintiff, or its predecessor, for employment. The circumstances attending that employment, as claimed by plaintiff, are to be found in the testimony of one Miller, the agent or manager with whom the matter was arranged. He produced a letter written by Mercer asking for employment and specifying the terms which he thought ought to be embodied in the contract. In this application he makes no reference to his financial ability, except as follows:

"I'm sending you letter from Cashier, F. H. Smith, showing that I am responsible for contracts I make, all of which I very respectfully submit for quick action."

The letter from Smith, who at that time was assistant cashier of the Washington National Bank, is as follows:

"John G. Miller & Co.,
          Chicago, Illinois.

"Gentlemen:—I have known Mr. C. E. Mercer for years, he is a stock holder in this Bank, has a good business record and is responsible for any contracts he makes.
                         Yours truly,
                              F. H. SMITH, A. Cashier."

Thereafter plaintiff and Mercer entered into a written contract whereby he was to serve plaintiff as salesman for one year from April 1, 1906, on terms designated therein.

While employed under this contract, plaintiff alleges that it advanced money to Mercer in excess of his salary to the amount of the claim allowed in its favor against his estate. In addition to the production of the foregoing documents, Miller testifies that he acted for his company in employing Mercer and that, in a personal interview with him, Mercer told him he was worth $10,000 and was a stockholder in the Washington National Bank. From this point, his examination, question and answer, proceeds as follows:

Q. "You may state whether or not in the making of the contract Ex. 8, you relied upon the statement of P. Ex. 2, and the fact that Mr. Mercer was a stockholder in the Washington National Bank in extending to him the credit, or making the payments to him which are the subject matter of this action?" (Ex. 2 here referred to is Smith's letter.)

A. "I did."

Q. "You may state what if any statement Mr. Mercer made to you regarding the amount of his holdings of Washington National Bank stock, to the best of your recollection?"

A. "I can't remember exactly, but it was not a large amount. Something like either three or five shares, something like that. Five I think it was, I am not sure. It has been some time ago."

Q. "You may state whether or not in the absence of knowledge of the ownership of the five shares of stock in the Washington National Bank, you would have entered into the contract P. Ex. 8 you have heretofore identified?"

A. "We would not."

Q. "When you say 'we would not,' do you mean John G. Miller & Co. would not have entered into such contract?"

A. "I do."

The foregoing is the sum total of all the evidence offered

or relied upon by the plaintiff as to what induced the witness and the company he represented to enter into the contract with Mercer or to extend him credit.

It further appears that, in 1908, and after the account or claim due plaintiff had accrued, Mercer arranged to go into partnership with one Dede to carry on a clothing business at Oskaloosa. About this time, he sold the ten shares of bank stock owned by himself, the proceeds of which, or the principal part thereof, were used to pay a debt which he owed to the bank. At the same time, he also sold his wife's shares of bank stock for about $3,600 and of the proceeds put about $1,300 into the business at Oskaloosa. What became of the rest of the money so received is not clearly shown, but it is quite certain none of it was paid over to defendant, unless it be in the final transaction, of which we shall later speak. The widow swears, and there seems to be nothing in the record contradicting her, that the sale of her stock and the use made by Mercer of the money so received were wholly without her knowledge or consent, and the fact did not come to her knowledge until very shortly before Mercer's death.

Not long after entering upon the Oskaloosa venture, Mercer's health began to fail, and he died on June 2, 1909. Shortly before his death, he sold his interest in the clothing business to his partner. The amount received upon this sale does not clearly appear, but we infer it was substantially the sum deceased had invested therein. Thereafter, and in evident view of his early decease, he expressed his desire to turn over to his wife all the property in his possession, saying it all belonged to her and he could die easier if he knew she had what she was entitled to. At that time, he had one or more bank certificates of deposit of a total value of not to exceed $2,500, and about the same time, a further sum of $563.09 was received from the sale of the Davenport property. He called in a friend and with his advice and assistance endorsed and delivered the certificates to his wife and paid or caused to be paid to her the cash item last above mentioned.

This seems to have included all in the way of property or estate which he then had, belonging either to himself or his wife, except a small cash balance of about $42 at the bank.

It should be said that, when not in business for himself, deceased was usually employed at a salary of $50 to $75 per month, but there is nothing in the record to indicate that he had made any accumulation from that source or indeed from any other source, unless it be the ten shares of bank stock which he held in his own name for some years and finally sold in November, 1908. He put no capital of his own into the mercantile business which he carried on in partnership with his brother-in-law, a business which seems to have resulted in no profit except, perhaps, the margin of $563.09 already mentioned. He put nothing into the Oskaloosa business except the $1,300 paid from the proceeds from his wife's bank stock. No other venture or investment of importance by him is shown and no other source of income or profit except the money and property he had received belonging to his wife. He took no pains to conceal the fact that he was dealing with her money, and it was commonly and well known by the banks and others with whom he dealt that such was the case. He was regarded, however, as a man of integrity, was active and industrious and enjoyed a fair degree of credit. That he dealt with her money and property as freely and unreservedly as if it were his own (except the one item hereinafter mentioned) is clear. She says she gave it into his hands to manage for her, and the evidence shows she permitted him to do so without restraint. He was evidently not a practical success as a business man and the funds he received from his wife gradually dwindled away until, at the time of the transactions immediately preceding his death, the remnant in his hands was little, if any, in excess of $3,000. The one item mentioned which he did not for a considerable period convert or deal with as his own individual property was the bank stock which the defendant had received from her parents. This stood and remained in her name at all times up

to November, 1908, when he sold it, though, as we have said, it is probable he collected the dividends accruing thereon. Defendant testifies, and there is nothing in the record to discredit her statement, that at the time she received the transfer of the property from her husband, she had no knowledge or notice that he owed anything to plaintiff or that any such claim was outstanding. Nor is there any showing that he was otherwise indebted or financially embarrassed. It was at this time also she first learned of the sale by him of her bank stock. Defendant, having qualified as administratrix, filed an inventory of the estate, showing only exempt property and the cash item of $42 above mentioned. She paid the cost of her husband's sickness and burial, amounting to several hundred dollars.

The question now arises whether, upon this practically undisputed showing, the plaintiff has the right, legal or equitable, to compel the defendant to account for the moneys and credits received from her husband before his

1. HUSBAND AND WIFE: wrongful possession of property: implied promise to return: one purchasing claims against other.

death, and apply them to the payment of its claim.

At the threshold of this inquiry, we have to determine whether defendant was a bona fide creditor of her husband to the extent of the value of the property received from him. Of this there is no room for doubt. Even if, for the purposes of this case, it be conceded that as to all other items of her property there was no contract relation with her husband and no contract obligation on his part which the law would enforce in her favor, this is certainly not the case concerning the promissory note of $1,864 and interest which she received from her father's estate, or the item of bank stock to the amount of $3,600, which he sold and disposed of without her knowledge or consent. The first was an express contract to pay, which was as valid and enforceable in her favor as it was in favor of the payee; and as to the second item, the law implies a promise to pay the value of the stock converted by him to the same extent

as if the parties were not husband and wife. *Dunham v. Bentley,* 103 Iowa 136; Code Sec. 3155.

These items alone, exclusive of interest, constituted an indebtedness in her favor of $5,404. The fact that she allowed her husband to handle and invest and use as his own all the remainder of her property affords no presumption nor is it proof that she forgave the debt evidenced by the note or that she had given or surrendered to him the title to the bank stock. Her position as creditor of her husband, at least to the extent indicated, is, therefore, impregnable. As such, she had the same right as any other creditor to accept payment or security from him, even though it absorbed his whole estate and operated to prevent collection of other valid existing claims. *Muir v. Miller,* 103 Iowa 127. This is, of course, subject to the elementary principle that the transfer must be made or security given in good faith, and not as part of a fraudulent scheme to defeat, hinder or delay creditors. There is no evidence whatever in this case that defendant received the property in question with any fraudulent purpose. On the contrary, her good faith is clearly and affirmatively proven. The amount received by her was much less than was justly due her from the deceased and the transaction by which she received it cannot be impeached on the ground that she was not a creditor or that she received it in bad faith, in the absence of some testimony fairly tending to prove that fact.

2. HUSBAND AND WIFE: payments by one to other: good faith.

We have then further to consider whether defendant can be held in any manner estopped to assert her claim or title against the plaintiff. In support of its demand in this respect, plaintiff relies upon the proposition that, where a wife permits her husband to use and deal with her property as his own, in such manner or under such circumstances as to justify creditors in believing that the property belongs to him in his own right (no evidence appearing that he is acting merely as an agent or trustee), and thereby and upon strength

3. HUSBAND AND WIFE: property of wife: husband's dominion over: estoppel.

of his apparent ownership credit is extended to him in good faith, she will be estopped to assert her title against the collection of debts so contracted by him. This rule is a familiar one which the courts do not hesitate to apply when the facts justify it; but we are quite clear that, giving plaintiff the full benefit of the most favorable construction which can be placed on the testimony, there is here no case for its application. Counsel for appellee, recognizing the limitation of the rule, concede in argument that, before an estoppel can be found, it must appear that the credit was extended on faith of the ownership of the property being in the husband, and if the creditor did not rely upon the fact of the title being in the husband and was not misled by such apparent ownership, the wife may assert her rights in the premises. *Devore v. Jones,* 82 Iowa 66.

Now what does the record show the plaintiff to have relied upon in extending credit to Mercer? Counsel for appellee argue the case as if defendant had allowed her husband to take and use her property as his own, and in such manner that plaintiff was justifiably misled into believing him the true owner and, on the strength of such apparent ownership, it was induced to extend him credit. The record wholly fails to make any such case. Plaintiff was doing business in Chicago and Mercer was living at Washington, Iowa. So far as appears, plaintiff knew nothing and had no information as to what property Mercer had in his possession or control, or what, if any, property there might be over which he was exercising dominion or acts of ownership, save only the statement of Mercer himself that he had four or five shares of stock in the Washington National Bank, and the general statement in the letter written by Smith that Mercer was a stockholder in the bank. Mr. Miller, the man who acted for the plaintiff, simply says that he relied upon the letter of Smith "and the fact that Mercer was a stockholder in the Washington National Bank in extending him the credit and making the payments to him which are the subject-matter of this action." He then

adds that Mercer told him he owned "three or five shares or something like that, think it was five," and that "in the absence of the ownership of the five shares of bank stock the plaintiff would not have entered into the contract." It appears without dispute that Mercer was then in fact the owner of *ten* shares of the stock and continued in the ownership thereof for two and a half years after that date. There is no statement or intimation that Miller made any further inquiries or was told of any other item or description of property which Mercer owned or claimed to own. Smith's letter makes no suggestion concerning Mercer's property except to say, "he is a stockholder in this bank," which in truth he was, and to say in general terms "he is responsible for any contracts he makes." Smith did not testify in the case and the court cannot say that he was deceived or misled by any apparent ownership by Mercer of the property of the defendant. Indeed, it is affirmatively shown that neither the bank for which Smith wrote nor Smith himself labored under any delusion as to the real ownership of the property in Mercer's hands. The defendant is not chargeable with any responsibility for the representation made by Smith nor for the reliance placed thereon by the plaintiff. Mercer is not shown to have made any representation or claim of ownership in the bank shares owned by his wife. They stood in her individual name and the record is wholly barren of any evidence that plaintiff believed or had any reason to believe that Mercer owned them or had any claim upon them, or indeed that it knew of their existence until after Mercer's death. In short, there is no evidence upon which any theory of estoppel can be properly grounded. As we have seen, plaintiff's only claim in evidence is that it extended credit upon faith of Mercer's ownership of five shares of stock and Smith's statement that Mercer was good for his contracts. Mercer was then in truth the owner not only of five but ten shares; Smith did not speak nor did he profess to speak for Mercer's wife, nor did he undertake to inform plaintiff what property Mercer owned or pre-

tended to own. Mercer, being justly indebted to his wife, had the right to prefer her before his other creditors. Until such preference was effected, the wife and plaintiff stood in equal right to enforce collection of their respective demands, but it is not to the discredit of the memory of the deceased that when death knocked at his door he recognized the superior moral claims of the wife whose patrimony he had wasted and to the extent of his ability restored it to her hand.

The decree below must be reversed and plaintiff's bill ordered dismissed.—*Reversed.*

DEEMER, C. J., LADD, PRESTON and EVANS, JJ., concur.